ALLEN SAWYER  SBN: 173565
555 Capitol Mall, Suite 1245
Sacramento, CA 95814
Telephone: 916-447-2070
Facsimile:  916-447-2097
E-mail: allen@allensawyer.com
Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAKIR KHAN, UMER HAYAT, ADNAN BILAL, ADIL ISMAEL, SAAD KHAN, BUSHRA SHAHEEN, NASAR KHAN, MIR AFZAL KHAN, SOMIYA BIBI, MUHAMMAD ASIF, SAFDAR KHAN, and MUHAMMAD BILAL KHAN,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF LODI, CALIFORNIA, LODI MAYOR MIKEY HOTHI, AND THE CITY COUNCIL OF THE CITY OF LODI,<br><br>Defendant. | Case # _____<br><br>EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER. |

To the Clerk of the Court and to the assigned Judge in the above-entitled case.

Plaintiffs will and hereby do request that the Court set a date as soon as practicable for hearing on this Application for Temporary Restraining Order. The urgency date in this matter is March 29, 2023, as will be explained in greater detail below. It is requested that the Court issue temporary orders to preclude Defendants from excluding Plaintiff Shakir Khan from exercising all the duties and powers of his elected office as a member of the Lodi City Council until such time as the Court may hear Plaintiffs' Motion for Preliminary Injunction.

Plaintiffs will not be seeking orders without Notice to the opposing parties.  Rather Plaintiffs counsel has met and conferred with counsel for Defendants and requested informal

resolution, which was refused. Plaintiffs will give Notice to all opposing parties and their counsel as soon as the Court sets a date for hearing on this Application. In this matter Plaintiffs are filing a Complaint for Declaratory and Injunctive Relief, a Notice of Motion and Motion for Preliminary Injunction and this Ex Parte Application for Temporary Restraining Order.

**Urgency:**

The issues raised here require the urgent attention of this Court because the Mayor and the City Council of Lodi, California, are barring their District 4 City Council Member, Shakir Khan, from sitting on the Council and representing his constituents. The Defendants erroneously contend that Khan resigned his position. They have announced that they are accepting applications from prospective candidates and intend to appoint another person to take Shakir Khan's seat as soon as a Council Meeting set for March 29, 2023. The conduct of the Council is depriving the voters of District 4 (joining as a putative class) of their rights to representation by the Council Member of their choice and Khan is deprived of his rights to his elected position. The requested temporary restraining order from this Court must be granted or the Plaintiffs will continue to be deprived of their rights at least until the Court can hear Plaintiff's Motion for Preliminary Injunction.

**Statement of Facts:**

Plaintiff, Shakir Khan, is the duly elected member of the City Council of the City of Lodi, California for City Council District 4 and the only Muslim Member of the Council. The named and unnamed members of the putative class are voters who elected Shakir Khan to his position as a member of the City Council. Khan's political opponents sought to remove him from office. Mikey Hothi, the Mayor of Lodi participated with Officers of the San Joaquin County Sheriff to investigate allegations and bring criminal charges of election fraud against Khan arising from his 2020 election.

Felony charges were brought against Khan and he was arrested on February 16, 2023, by Sheriff's Officers. Khan was taken to the jail, dressed in inmate clothing, held incommunicado and taken to an interrogation room in the booking area where officers had set up a meeting with Lodi Mayor Mikey Hothi. (See: Declaration of Shakir Khan, attached.)

1    Hothi was working with Sheriff's Officers, who stood by observing the meeting and
2 assisting Hothi.  The officers recorded the meeting on their body cameras.  The Mayor questioned
3 and discussed the matters with Khan.  The police and the Mayor had set up the meeting, which
4 Khan did not ask for, with a primary purpose of prevailing upon him to resign from the Council,
5 and in that way to incriminate himself in the criminal case.
6    It was apparent to Khan that the Mayor was working with the Sheriff's officers. Khan
7 indicated he wanted to talk to his wife, his family and his attorney saying "they haven't let me
8 contact my wife or anything."  The Plaintiff was held incommunicado prior to and throughout the
9 encounter with the Mayor.  He stated that he would be speaking to his attorney, Allen Sawyer, [at
10 the court appearance the next day.] (Exhibit A - Transcript of Jail Meeting.)
11    The Mayor told Khan he had talked to various of Khan's friends and they thought he
12 should resign.  He said, "I talked to Steve.  I talked to Janice. I talked to everybody."  He said,
13 "They think you need to resign too."  He also said he had talked to the District Attorney. (Exhibit
14 A.)
15    Despite Khan's protestations of innocence and his willingness to fight the criminal case,
16 the Mayor was insistent that he should resign.  It is not known whether the Mayor had actually
17 talked to the D.A. or whether the D.A. had said she wanted Khan to resign, but that was the
18 impression Khan was given.  Of course he thought if he gave the D.A. what he wanted, the
19 criminal case would go better for him and, if not, it would go worse.
20    The Mayor, acted like he was there to give the Plaintiff advise, telling him he did not
21 want his kids to continue seeing the national media coverage and, if he resigned, the Mayor could
22 go to the media and tell them Khan had agreed to resign.  Mayor: "And I think that's the right
23 course . . ."   Khan responded that he would talk to his attorney the next day and then his attorney
24 could issue a statement.  The Mayor ignored Khan's wish to consult with his attorney and asked
25 the officers to get him a pen and paper, which they immediately did.  (Exhibit A.) The Mayor
26 wrote out a statement saying:
27                    Mayor Mikey Hothi &
28                    Shak Khan have spoken

                                                    & believe the best course

                                                  of action at this time

                                                  is for Shak Khan to resign

                                                  from the Lodi City Council

                                                  fight the charges against him &

                                                  clear his name. (See: Exhibit B,

                                                  (handwritten statement.)

      As soon as the Mayor left the jail, Khan was allowed to make phone calls.  He immediately called the Mayor and told him he was not resigning and did not authorize the release of any statement "on his behalf."  The next day, Khan informed the City Manager and the City Clerk of the same by email. (Exhibit A, Declaration of Shakir Khan.)

      Days after Khan repudiated and rescinded his offer to resign, on March 7, 2023, the Lodi City Council held a special session.  At that session the Council did not purport to accept Khan's resignation but excluded him from sitting on the Council.  The Council then voted on whether to fill the seat for District 4 by a special election in November of 2023, or to have the Council appoint another resident of District 4 to become the Council Member for that Council District.  It has been reported variously that the four Council Members in attendance voted 3 to 1, or 3-0, to have the Council Members appoint a new City Council Member. (Declaration of Allen Sawyer.)

      The Council has now announced that they will be accepting applications from candidates for Khan's seat on the Council as of March 17, and that at a Council meeting on March 29, 2023, they will interview applicants and the "current Council" may vote and install a replacement Council Member to represent District 4. (Declaration of Allen Sawyer.)

**Legal Issues:**

**A.  Khan's agreement that resignation would be the best course does not constitute a resignation and he is still the duly elected representative of the voters of Council District 4:**

      Since the Mayor and Shakir Khan signed the agreement in the jail, the City Council has excluded Khan from their meetings and refused to permit him to carry out any of the duties or

powers of his office. They have publically claimed that he resigned from the Council and have taken steps to replace him. They do so in reliance on the claim that the hand written agreement Khan and the Mayor signed was his resignation. It was not. He has publically stated he did not resign.

The agreement must be understood in the context of the conversation. After repeatedly imploring Khan to resign, the Mayor proceeded:

> Mayor (04:06):
> Yeah, I, I think just save yourself the headache. We'll, I'll, you know, I could, I'm happy to put out a statement saying I talked to Council Member Khan. He agreed to resign. And I think that's the right course of, I'm not gonna say anything to make it [inaudible 00:04:18].
>
> Shakir Khan (04:17):
> **Yeah. I will talk with my lawyer yes**... tomorrow, and then just have him, you know, make a statement. Is that better?
>
> Mayor (04:23):
> Yeah. Yeah. Well, uh, so if it's okay with you, I'd like to just, um, can I get a, a pen and a piece of paper?
>
> Let, let me just write out something for you. (Exhibit A Emphasis added.)

The document on its face purports only to be an agreement to the fact that Khan's resignation (presumably after consulting with his attorney) would be the best course. An actual resignation would have said, "I resign," "I am resigning," "I hereby resign," or "I resign as of [a particular date or time]. Rather it says that the signatories, "believe the best course of action at this time is for Shak Khan to resign . . ." To agree that resignation is the best course is not the same as to commit to that course. Nor an agreement to that effect, in and of itself, the accomplishment of that course of action.

It could be argued that it was an offer to resign. The tender and acceptance of an offer of resignation is a matter of contract. (*Leithliter v. Board of Trustees* (1970) 12 Cal.App.3d 1095, 1099; *Sherman v. Board of Trustees* (1935) 9 Cal.App.2d 262 [49 P.2d 350].) California courts have held that "[r]esignations are contractual in nature" (*Mahoney v. Board of Trustees* (1985) 168 Cal.App.3d 789.) "As such, a resignation is an offer which may be withdrawn prior to its acceptance." (*Ibid*.; see Civ. Code, § 1586, *T. M. Cobb Co. v. Superior Court* (1984) 36 Cal.3d 273, 278.) In other words, one "has a right to rescind a resignation unilaterally like any

contractual offer prior to its acceptance." (*Ulrich v. City & County of San Francisco* (9th Cir. 2002) 308 F.3d 968, 975.)

Here, the Plaintiff immediately withdrew and revoked any offer to resign long before such offer was accepted. The jailhouse meeting with the Mayor was completed at about 4:15 p.m. Khan was permitted by the Sheriff's officers to make phone calls shortly thereafter. He called his attorney for a brief conversation. Then he called the Mayor, about ten minutes after the "resignation" document was signed, and told him he was not resigning and did not authorize the Mayor or anyone else to issue any statement on his behalf.

When he was released from jail the next day, Khan sent emails to the City Clerk and the City Manager telling them he did not resign or authorize the release of any statement on his behalf. Thereafter, when Khan next attended a meeting of the Lodi City Council to represent his constituents, the Council refused to allow him to participate.

Lodi City Ordinances, Title 2, Chapter 2 - City Council Meetings, Section 2.04.060 provides:

> A majority of all members elected to the council shall constitute a quorum at any regular or special meeting of the council. Unless otherwise required by law, a simple majority of the members present may take action or adopt ordinances or resolutions.

In this matter, the City Council not only did not accept Khan's alleged offer to resign before he rescinded the offer, they never voted to "take action" on Khan's offer at all. Thus, Khan remains the duly elected representative of the voters in Lodi City Council District 4 and his constituents are deprived of their rights to representation.

**B. Plaintiff Khan's agreement that resignation would be the best course was involuntary:**

Khan's decision to sign the agreement was not knowing, intelligent and voluntary, either as a practical matter or as a legal matter. It was a product of subterfuge, and implied threats and promises. First, the Mayor was not there to give Khan friendly advise. The Mayor had been working with investigators to bring the criminal charges. The Sheriff's officers did not let the Mayor into the jail and set him up in an interrogation room with Khan for a friendly chat. Rather, the Mayor was working with officers to get Khan to resign, thereby creating the narrative that he

6

did so because he knew he was guilty. Khan was disoriented, deprived of his hearing aids, under the threat of criminal prosecution, facing a lengthy prison sentence and held incommunicado in a police dominated atmosphere—namely, a small, windowless room in the bowels of the police station. (*Smith v. Clark* (2015) 612 Fed. Appx. 418.)

It could not have escaped Khan's attention that the Mayor was working with the police and prosecution. The police arrested and accused him, the police isolated him from everybody else and refused to let him telephone his attorney. But they engineered an in-custody meeting with the Mayor. The police stood by and watched the entire meeting with the Mayor and recorded it on their body cameras. When the Mayor was unprepared to immediately draft an agreement to resignation for Khan to sign he asked the police for a pen and piece of paper. An officer then provided pen and paper to the Mayor within 26 seconds.

This Court cannot doubt that the Mayor was working with the police and was an agent of the police. It goes without saying that, when the police allow an inmate's friends to visit them in jail, the friend speaks through glass on a telephone. When an agent of the police goes into the jail with the intent of eliciting from the inmate some incriminating admission and having him sign a document, they set him up in a room where the document can be passed back and forth.

If an agent of the police or prosecution, by their words or actions elicit incriminating statements from an in-custody suspect, that is interrogation and requires Miranda warnings. Implicit in the definition of "interrogation" is that (1) the suspect is talking to the police <u>or an agent of the police</u>, and (2) the suspect is aware that he is talking to the police or one of their agents. (*Rhode Island v. Innis* (1980) 446 U.S. 291, at p. 295 [speaking with police]; *In re I.F.* (2018) 20 Cal.App.5th 735, 773 [same]; *People v. Ghent* (1987) 43 Cal.3d 739, 750–751 [speaking with psychiatrist retained by the police]; *People v. Sanchez* (1983) 148 Cal.App.3d 62, 69–70 [speaking with doctor working with police in presence of police]; see also *Estelle v. Smith* (1981) 451 U.S. 454, 467–468 speaking with prison psychiatrist pursuant to court order].)

In *People v. Sanchez* (1983) 148 Cal. App. 3d 62, 69, for another example, a doctor conducting a physical exam of a defendant, who also asked him questions which elicited incriminating responses, was found to be an agent of law enforcement. (Citing *People v. Walker*

1 (1972) 29 Cal.App.3d 448, 453, and *Estelle v. Smith* (1981) 451 U.S. 454.)

2  Here, the Mayor was interviewing a defendant to secure evidence on behalf of the police. It could be argued that, if the Mayor and the police planned only to obtain Khan's consent to retire from the City Counsel, that would be a civil matter and would not require a Miranda warning. However, self-incriminating statements given by a jailed defendant during a civil investigation are also inadmissible in a criminal prosecution when the defendant is not given *Miranda* warnings. (*Mathis v. United States* (1968) 391 U.S. 1, Thus, such statements are involuntary as a matter of law.  Here, the resignation document is a self-incriminating statement.

  Here, the Mayor promoted the idea that he was there to give Khan advise, but, in fact he was there to promote the agenda of the police.  It may well be said that his primary intention was to get Khan to agree to resign, but any such agreement would be an incriminating statement.  That is why the Mayor insisted on getting it in writing.

  Though the Mayor did not directly threaten Khan, he told him he had talked to numerous players in the drama and they all thought it would be a good idea for Khan to resign.  Then he said he had talked to the District Attorney, and implied that the D.A. also wanted Khan to resign.  A statement to law enforcement, or their agents, is deemed involuntary if procured by an express or implied promise of benefit beyond that naturally flowing from a truthful statement, or by an express or implied threat that the failure to make a statement will result in consequences adverse to the suspect. (*In re G.* (1975) 53 Cal. App. 3d 198, 202.)

  The document which the Mayor prepared with the help of police, and had Khan sign implicated him in the criminal case for election fraud.  And that was at least one purpose of the Mayor's contact - to get Khan to sign the resignation paper which incriminated him.  At a trial of the charges of election fraud, the fact that Khan agreed to resign tends in reason to prove consciousness of guilt.  Evidence of that will be admissible against Khan in a criminal trial.  But, before eliciting Khan's agreement and his signature on that document, nobody advised him of his rights per *Miranda v. Arizona* (1966) 384 U.S. 436.  When the Mayor began to talk about Khan immediately resigning and the Mayor putting out a statement saying he had so agreed, Khan indicated that he wanted to talk to his attorney, and knowing that he was being held

incommunicado, said he would talk to his attorney about it the next day. Thus, he clearly indicated he wanted to consult with his attorney before thus incriminating himself.

Khan was understandably very afraid of the significant criminal consequences he faced and wanted to curry favor with the Mayer, the police and the D.A. He even thanked the Mayer for coming to "advise" him. (Transcript, p. 5.) But he also knew the Mayer was working with the police, and apparently with the District Attorney. So he did what many criminal defendants do, particularly those not advised of their rights to an attorney and to remain silent, he gave them what they wanted.

Thus, an arrested defendant was held incommunicado in the proverbial bowels of the police station, confronted by an agent of the police and prosecution, and allowed to speak to no one except that police agent who was sent there to obtain an incriminating statement with the defendant's signature. That police agent ignored the un-Mirandized criminal defendant's statement that he wanted to talk to his attorney and then elicited a statement in writing incriminating him. That is involuntary as a matter of law.

That conclusion is further supported by the fact that, as soon as police finally permitted Khan to make telephone calls, he immediately called his attorney and then called the Mayor to tell him he was not resigning.

**C. The Court should issue a Temporary Order to prevent irreparable harm to Plaintiff Shakir Khan and to the voters of District 4 who elected him:**

The Lodi City Council has voted to appoint another person to replace Shakir Khan on the Council. After receiving and considering applications for the position, on March 29, 2023 the Council will consider the applications and may vote to install another person in Khan's Council seat. Thus, absent a Temporary Order to prevent it, the voters are deprived of their right of representation and may be permanently so deprived as early as March 29, 2023, for the remainder of Shakir Khan's term.

This harm is irreparable by definition. Without court intervention at this time, the voters will never regain their rights to representation by the elected official of their choice and can never be compensated for that deprivation. In *Rossito-Canty v Cuomo* (2015, ED NY) 86 F. Supp. 3d

175, the Governor of New York delayed setting a date for a special election to fill a vacancy in U.S. House of Representatives until the next general election. Voters sued to compel the Governor to set a date as soon as possible, since voters of the congressional district were being deprived of their constitutional rights of representation. The Court stated, "The right to representation in government is the central pillar of democracy in this country. Unjustified delay in filling a vacancy cannot be countenanced."

The *Rossito-Canty* Court found the Plaintiffs had demonstrated irreparable harm because since money damages could not make them whole, they lost their ability to participate not only in the making of the nation's policies at large, but in those that affect their daily lives. Thus, the voters were bereft of an advocate to help them navigate the morass of government bureaucracy.

Plainly, the same is true here. The voters of District 4 in Lodi do not have an advocate to help them in City policy and decisions and money damages cannot make them whole. They are deprived of the representation for which the majority of District 4 voters voted, both before and after the planned appointment to fill Shakir Khan's seat on the Council.

To obtain a temporary restraining order, the requesting party must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the Board's favor, and (4) that an injunction is in the public interest. (*Frankl v. HTH Corp.*, 650 F. 3d 1334, 1355 (9th Cir. 2011) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)). In this Circuit, however, courts employ a "sliding scale" approach, such that "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." (*Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131 (9th Cir. 2011).

Success on the Merits: The evidence here clearly shows a likelihood of success on the merits. Plaintiff Khan plainly did not resign his position on the Council. Under pressure, he signed a document he did not draft saying he believed his best course of action would be to resign but then, clearly did not follow that course of action. An offer to resign, or even an actual resignation, is not effective if rescinded, withdrawn or revoked before it is accepted. There is no

evidence any offer was accepted.

Irreparable harm: Fundamental rights are as serious as it gets. The voters' rights to representation are being, and will continue to be, irreparably denied. Likewise, Khan's right to his elected post. Other forms of relief would be completely inadequate to alleviate those harms.

Balance of equities: The balance of equities tip decidedly in favor of immediate relief, i.e. a temporary order. If this Court fails to act it will result in continued deprivation of fundamental rights of the Plaintiffs. As the *Rossito-Canty* Court noted, "hardship to plaintiff is great and continuing." (*Rossito-Canty v Cuomo* (2015, ED NY) 86 F. Supp. 3d, at p. 200.) The temporary order will work no hardship on the Defendants at all, as they will only be prevented from filling the Council seat with a non-elected person and only so long as it takes for this Court to decide Plaintiffs' Motion for Preliminary Injunction. In the mean time, under a temporary order, the seat will be filled and the voters of District 4 will be represented by their elected choice of Council Members.

Finally, the Temporary Order is in the public interest. The Defendants are unconcerned with the public interest and just want to get rid of a Council Member who is not in line with their political agendas. But the public, the majority of whom voted for Shakir Khan, have a strong public interest in their right to representation.

**Conclusion:**

For the reasons stated, it is respectfully requested that the Court issue a temporary restraining order, to be in place until the hearing on Preliminary Injunction or further order of the Court, 1) enjoining Defendants from preventing Plaintiff Shakir Khan from exercising all the duties and powers of his elected office, 2) to prevent Defendants from accepting applications for or appointing a new Council Member in the place of Shakir Khan and 3) enjoining Defendants from scheduling or holding and special election to fill the Council seat for District 4.

Date: March 24, 2023

*Allen Sawyer*
_____
N. ALLEN SAWYER